**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| 707 G Street Restaurant, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 20-685 (RMM) |
| | ) |
| Jemal's Mickelson, LLC, et al., | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OPINION**

This case arises from Plaintiff 707 G Street Restaurant LLC, temporarily doing business as Misconduct Tavern's ("G Street"), frustrated plan to take over a lease and open and operate a sports bar at premises owned by Defendant Jemal's Mickelson, LLC ("JM").  G Street contends that JM refused to follow through on assigning the lease, at the direction of its affiliate Douglas Development Corporation ("Douglas"), and that this eleventh-hour change caused G Street to incur substantial financial losses.  To redress that injury, G Street initiated this action, and raises claims of breach of contract, fraudulent inducement, promissory estoppel, and tortious interference, and also seeks relief under the Declaratory Judgment Act.

Currently pending before the Court is Defendants' Motion to Dismiss G Street's Amended Complaint for failure to state a claim (the "Motion").  *See* Defs.' Mot. to Dismiss, ECF No. 24 ("Defs.' Mot.").  For the reasons explained below, the Court **GRANTS** the motion with respect to counts two and four but **DENIES** the motion with respect to counts one, three, and five.

## BACKGROUND[1]

JM is the owner and landlord of rentable space located at 707–09 G Street, N.W., Washington, D.C. 20001 ("the Premises").  *See* Pl.'s Am. Compl. ¶ 16, ECF No. 6.  On September 29, 2016, JM and Phillip's Seafood—Ten Tavern and Grill, LLC ("Ten Tavern") entered a ten-year lease ("the Lease"), which provided that Ten Tavern would rent and operate a sports bar at the Premises.  *See id.* ¶¶ 16–18; Ex. A, ECF No. 6–1.  The Lease expressly permitted Ten Tavern to assign the Lease to a third party, so long as the third party would use the Premises to engage in activity permitted by the Lease.  Ex. A at 28.  In March 2018, Ten Tavern contacted Charles Ercole, who owned and operated several sports bars under the "Misconduct Tavern" brand, to gauge his interest in taking over the Lease from Ten Tavern.  *See* Am. Compl. ¶¶ 29–30; Ex. B, ECF No. 6–2.  Ten Tavern received approval from JM before reaching out to Mr. Ercole.  *See* Am. Compl. ¶¶ 31–32.

After Ten Tavern's initial email to Mr. Ercole, the two parties, along with JM, "began discussing the transaction in earnest."  *Id.* ¶¶ 36–37.  These discussions included various phone calls and emails in which Mr. Ercole provided JM with "financial statements and other information regarding the 'Misconduct Tavern' brand and . . . Mr. Ercole's finances."  *Id.*  At no point did JM express concern regarding the financial information or Mr. Ercole's ability to operate a sports bar at the Premises.  *Id.* ¶ 38.  After various telephone calls and emails, Mr. Ercole, JM, and Ten Tavern agreed that Mr. Ercole would open the "Misconduct Tavern" sports bar at the Premises in late summer or early fall of 2018.  *Id.* ¶¶ 37–40.

---

[1] The facts recited below are based on Plaintiff's Amended Complaint, which must be presumed true when resolving a 12(b)(6) motion.  *See Ashcroft v. Iqbal*, 55 U.S. 662, 678 (2009).

To prepare for the assignment, Mr. Ercole formed "707 G Street Restaurant LLC." *Id.* ¶ 41(a).  From May 2018 through August 2018, Plaintiff applied for the necessary business licenses, permits, and insurance, ordered custom signage, and contracted workers "to clean, repair, and make improvements to the Premises." *Id.* ¶ 41(a)-(g).  JM granted G Street's contractors access to the Premises by providing them with a security fob for the elevator. *Id.* During this time, Plaintiff and Defendants JM and Ten Tavern "negotiated and agreed upon material terms of an assignment of the Lease" (the "Agreement") in accordance with extensive input from the parties' attorneys. *Id.* ¶¶ 42–43.  G Street, JM, and Ten Tavern all "agreed to all of the material terms of the Assignment and began to finalize the agreement for execution" by the end of August 2018. *Id.* ¶ 45.

The amicable relationship stopped there.  Ten Tavern and G Street each executed the Agreement and G Street made a security deposit of $50,000. *Id.* ¶ 46; *see also* Ex. C ¶ 7.2, ECF 6–3; Pl.'s Errata, ECF No. 34.  JM, however, did not execute the Agreement.  Am. Compl. ¶ 46. Instead, JM informed Ten Tavern, for the first time, that "it was no longer interested in assigning the Lease." *Id.*  JM allegedly did so at the direction of its affiliate, Douglas, which wanted to use the Premises "to obtain more lucrative office and commercial tenants." *Id.* ¶ 52.  Despite G Street and Ten Tavern's attempts to persuade JM to follow-through with the assignment of the Lease, JM refused. *Id.*  As a result, G Street brings five claims: (1) breach of contract against JM, (2) fraudulent inducement against JM, (3) promissory estoppel against JM, (4) declaratory relief against JM and Ten Tavern, and (5) tortious interference against Douglas. *Id.* ¶¶ 63–105. Defendants JM and Douglas have moved to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *See generally* Defs.' Mot.  The motion is fully briefed and ripe for review.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint if the plaintiff fails to "state a claim upon which relief may be granted."  In its complaint, the plaintiff must allege facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2).  The moving party bears the burden of demonstrating that the plaintiff's complaint is legally insufficient. *Id.*

In this context, the court must "accept as true all of the allegations" in the complaint and must construe those allegations "liberally in plaintiff's favor." *Redding v. D.C.*, 828 F. Supp. 2d 272, 277–278 (D.D.C. 2011) (quoting *Kowal v. MCI Comm's Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)); *see also Byrne v. Clinton*, 410 F. Supp. 3d 109 (D.D.C. 2019), *aff'd sub nom. Byrne v. Brock*, No. 19-7120, 2020 WL 1487757 (D.C. Cir. Feb. 27, 2020) ("[T]he Court must construe the complaint in [Plaintiff's] favor and treat all well-pleaded factual allegations as true.").  This means that the court should draw "all inferences that can be derived from the facts alleged" in the light most favorable to the plaintiff. *Kowal*, 16 F.3d at 1276.  Statements in the complaint which are "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" are insufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.*, 550 U.S. at 545).  Instead, they must be set aside, and the court must determine whether the remaining factual allegations in the complaint "allow[] the court to draw the reasonable inference that the defendant is liable." *Id.*  In making its decision, the court must rely only on the complaint, any documents attached as exhibits or incorporated by reference in the complaint, and facts of which the court may take judicial notice. *See Brown v. D.C.*, 390 F. Supp. 3d 114, 122 (D.D.C. 2019).

## DISCUSSION

### I.  Breach of Contract

The Court must first determine whether G Street has sufficiently pleaded its breach of contract claim again JM.[2]  To state a claim for breach of contract, a plaintiff must allege "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Ihebereme v. Capital One, N.A.*, 730 F. Supp. 2d 40, 47 (D.D.C. 2010) (quoting *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009)).  JM limits its challenge to the first element—the existence of an agreement—and the Court therefore limits its analysis to that aspect of the breach of contract claim.  *See generally* Defs.' Br. in Supp. of Defs.' Mot., ECF No. 24–1, at 3–5 ("Defs.' Br.").  Under District of Columbia law,[3] a valid and enforceable contract exists where there is agreement as to all material terms, each party assumes mutual obligations, and the parties intended to be bound by, or "mutually assent[ed]" to, the contract's terms.[4]  *Dyer v. Bilaal*, 983 A.2d 349, 356 (D.C. 2009) (citing *EastBanc v. Georgetown Park Assocs.*, 940 A.2d 996, 1002 (D.C. 2008)).

---

[2] "This court has consistently held that 'leases of urban dwelling units are to be construed as any other contract.'" *Davis v. Winfield*, 664 A.2d 836, 837–38 (D.C. 1995) (citing *Mgmt. Partnership, Inc. v. Crumlin*, 423 A.2d 939, 941 (D.C. 1980)).

[3] The parties do not address choice of law.  The Court assumes that D.C. law, which the parties rely on in their briefs, is applicable.  *See In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1495 (D.C. Cir. 1991) ("[C]ourts need not address choice of law questions *sua sponte*."); *Davis v. Grant Park Nursing Home LP*, 639 F. Supp. 2d 60, 65 (D.D.C. 2009) (explaining that, where all parties assume that D.C. law applies, "[t]he Court need not and does not question the parties' assumptions on that point").

[4] Defendants do not challenge the existence of a final agreement to the material terms of the Agreement, nor whether the Agreement required each party to undertake mutual obligations. *See generally* Defs.' Br. at 3–5.  However, for completeness, the Court finds that Plaintiff has sufficiently pleaded these elements.  *See* Am. Compl. ¶¶ 41–42, 44–46 (alleging that JM's principal and representative frequently communicated with G Street's principal about assigning the Premises and that G Street's principal and JM's counsel had "extensive and numerous inputs into all facets of the Assignment," the terms of which all parties ultimately agreed to and memorialized in writing).  *See also id.*, Ex. C (establishing the obligations of Ten Tavern as

The thrust of JM's argument is straightforward: because JM did not sign the Agreement, no contract was formed. That oversimplifies the issue. Although mutual assent "is most clearly evidenced by the terms of a signed written agreement . . . such a signed writing is not essential to the formation of the contract. The parties' act[ion]s at the time of the making of the contract are also indicative of a meeting of the minds." *Kramer Assocs., Inc. v. Ikam, Ltd.*, 888 A.2d 247, 252 (D.C. 2005) (quoting *Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995)) (internal citations omitted).

> When the parties to a contract set forth the terms of their agreement in writing and manifest in some manner a clear intent to be bound, the absence of one party's signature on the written agreement will not defeat or invalidate the contract. The purpose of a signature is simply to demonstrate mutual assent to a contract, but that may be shown instead, or in addition, by the conduct of the parties.

*Davis*, 664 A.2d at 838 (internal citation omitted). Indeed, "there is no surer way to find out what parties meant, than to see what they have done." *United House of Prayer for All People v. Therrien Waddell, Inc.*, 112 A.3d 330, 342 (D.C. 2015) (quoting *Vacold LLC v. Cerami*, 545 F.3d 114, 123 (2d Cir. 2008)).

G Street plausibly alleges that JM's *conduct* betrays its true intent to be bound, even though the Agreement itself remained unsigned. Put simply, G Street started acting like a tenant and JM acted like a landlord. Am. Compl. ¶¶ 40–41. G Street picked an opening day for the new Misconduct Tavern; JM did not object. *Id*. ¶ 39. G Street obtained various incidentals, such as signage, insurance coverage, various necessary licenses, and, at JM's insistence, a guarantor; JM did not object. *Id.* ¶¶ 41(a)–(e). G Street employees and contractors also traveled to the property to clean, repair, and make improvements; not only did JM not object, it gave G Street's contractors key fobs to facilitate their ability to do so. *Id.* ¶¶ 41(f)–(g).

---

assignor, G Street as assignee, and JM as landlord in relation to assigning the Premises).

While G Street was preparing to open the sports bar, the parties, including JM, reached an agreement on the material terms of the Assignment.  *Id.* ¶ 42.  Matthew Jemal, JM's principal, along with JM's attorneys, had "extensive and numerous inputs into all facets of the Assignment," and "[b]y the end of August 2018, all parties—landlord JM, tenant Ten Tavern and assignee G Street—agreed to all of the material terms of the Assignment and began to finalize the agreement for execution."  *Id.* ¶¶ 43–45.  Shortly before G Street was to take possession of the property, G Street signed the Agreement, along with Ten Tavern, and sent it to JM with a $50,000 security deposit.[5]  *Id.*  ¶¶ 45–46.  Taken together, JM's silence in the face of, and, at times, active facilitation of, G Street's performance of a negotiated, written agreement is enough to plausibly establish that JM intended to be bound by that agreement.  Discovery may well reveal facts to show that JM had no such intent—but as pleaded, and drawing all inferences in favor of G Street, G Street's breach of contract claim survives 12(b)(6) scrutiny.

*Davis v. Winfield*, 664 A.2d 836 (D.C. 1995), supports G Street's assertion that the breach of contract claim adequately pleads an intent to be bound.  There, the court analyzed whether the parties—three potential tenants and a landlord—intended to be bound by a lease left unsigned by the landlord.  *See id.* at 838.  Each tenant signed both a rental application and a lease, obtained a co-signor, and paid a security deposit to the landlord as required by the lease, which caused her to remove the property from the market.  *Id.* at 837.  Because of a later dispute, the tenants walked away, and both the tenants and the landlord sued; the tenants to recover money paid as a security deposit and the landlord for breach of contract.  *Id.*  The lower court found that no contract existed because the landlord never signed the lease.  *Id.* at 838.  The Court

---

[5] The Complaint alleges that the Agreement was signed and circulated at the end of August 2018, but the Agreement is dated September 4, 2018.  *See* Am. Compl, Ex. C.  The discrepancy does little to affect the Court's analysis.

of Appeals, however, reversed.  *Id.*  Relevant here, the court found that the landlord's "failure to sign her copy of the lease was not determinative of the validity or the existence of the contract," and instead found that the true issue was the parties' intent.  *Id.*  The court remanded, finding that because the landlord accepted the tenants' security deposit, took the property off the market, and was prepared to turn over the keys to the property, there was evidence of her intent to be bound, even absent her signature.  *Id.*  Like the landlord in *Davis*, JM acted as though a final contract existed and permitted partial performance.  JM permitted G Street to set a move-in date, obtain signage and licenses, and even make repairs and renovations to the property.  *See* Am. Compl. ¶¶ 41(a)-(g).  JM directed G Street to obtain a guarantor, and it did.  *Id.* ¶ 37.  JM accepted G Street's security deposit, and even went a step beyond the landlord in *Davis* by giving G Street access to the property.  *See id.* ¶¶ 41(g), 46.  Taken together and construed in the light most favorable to G Street, this alleged conduct plausibly establishes that JM intended to be bound by the Agreement.

All that remains is JM's claim that Paragraph 8.1—which reads "[T]his Assignment shall become effective on and only on its execution and delivery by each party hereto"—is a condition precedent absent which no contract could exist.  *See* Defs.' Br. at 4–5.  "A condition precedent may be defined as 'an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.'"  *Washington Properties, Inc. v. Chin, Inc.*, 760 A.2d 546, 549 (D.C. 2000) (quoting Restatement (Second) of Contracts § 224 (1981)).  "No particular form of words is necessary in order to create an express condition; however, words and phrases such as 'if' or 'provided that,' qualifying a promise, are commonly used to indicate that the duty of the promisor has expressly been made conditional."  *Washington Properties*, 760 A.2d at 549.  "[W]hether a provision in a contract constitutes a condition

precedent is [a question] of construction dependent on the intent of the parties to be gathered from the words they have employed and, in case of ambiguity, after resort to other permissible aids to interpretation." *Id.* (internal citation and quotations omitted). Paragraph 8.1 is not ambiguous. As written, it indicates that execution and delivery by all parties was a condition precedent to the effectiveness of the agreement.[6]

However, that is not the end of the road for G Street; nonoccurrence of a condition precedent is not determinative of the existence of a contract if that condition was waived. *See, e.g.*, *Nortel Networks, Inc. v. Gold & Appel Transfer, S.A.*, 298 F. Supp. 2d 81, 86 (D.D.C. 2004). Drawing all inferences in favor of G Street, it has pleaded facts that suggest JM waived the protection of its condition precedent. Waiver is "an intentional relinquishment or abandonment of a known right or privilege," and "is an equitable principle designed to 'avoid a harsh result when the parties have conducted themselves in such a way as to make that result unfair.'" *Id.* at 88 (internal citation and quotations omitted). "Waiver can occur by mutual agreement when the parties manifest an intent to be bound by the contract, even though a stated condition precedent has not been satisfied." *Molton, Allen & Williams, Inc. v. Harris*, 613 F.2d 1176, 1179 (D.C. Cir. 1980) (citing 1 Williston on Contracts § 76, at 251 (3d ed. 1957)). Whether waiver has occurred is typically a question for the trier of fact. *See Safer v. Perper*, 569 F.2d 87, 99 (D.C. Cir. 1977); *Britamco Underwriters, Inc. v. Nishi, Papagjika & Assoc., Inc.*, 20

---

[6] The Court rejects G Street's assertion that interpreting Paragraph 8.1 to be a condition precedent effectively "invalidates" the body of D.C. law finding mutual assent even without the signature of all parties. *See* Pl.'s Mem. in Opp'n to Defs.' Mot. at 14, ECF 31 ("Pl.'s Opp'n"). The cases cited by G Street—and many cited by the Court itself—pertain only to mutuality of assent, not conditions precedent; they implicate distinct doctrines in contract law. If Paragraph 8.1 were not part of the Agreement, the Court would have no trouble finding a valid contract. Here, not only did JM not sign the Assignment, there is also a contractual provision explicitly *requiring* a signature for the contract to become enforceable.

F. Supp. 2d 73, 77 (D.D.C. 1998) (a finding of waiver "turns on the intent of the party ostensibly waiving the right, a state of mind which must be culled from the specific facts and circumstances surrounding the purported relinquishment."). Evidence of conduct "inconsistent with an intent to enforce a contract right" can be used to determine if there has been waiver. *Nortel Networks, Inc.*, 298 F. Supp. 2d at 87–88.

While G Street does not explicitly plead waiver, it does plead the facts necessary to support a finding that waiver occurred. That is all it is required to do at this stage. The 12(b)(6) standard requires that the Court draw "all inferences that can be derived from the facts alleged" in the light most favorable to the plaintiff. *Kowal*, 16 F.3d at 1276. As discussed above, G Street alleges facts that would allow a factfinder to conclude that JM "manifested an intent to be bound by the contract" even though it had not signed the Agreement. Am. Compl. ¶¶ 39, 41(a)–(g), 65. JM's conduct could be construed as proof that JM did not intend to enforce the condition precedent. These facts, taken together, are enough to state a plausible breach of contract claim. Therefore, the motion to dismiss Count I is **DENIED**.

## II. Fraudulent Inducement

The Court next considers whether G Street's fraudulent inducement claim satisfies Rule 12(b)(6).[7] To state a claim for fraudulent inducement, a plaintiff must allege that "(1) the defendant[s] made a false representation, (2) the representation was in reference to a material

---

[7] Because G Street pleads its fraudulent inducement claim in the alternative to its breach of contract claim, the Court need not address the interaction of tort and contract law. *See generally Butler*, 459 F. Supp. 3d at 96 (citing *Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1354 (7th Cir. 1995)) ("Courts tend not to allow plaintiffs to allege fraudulent inducement alongside claims for breach because '[t]here is a risk of turning every breach of contract suit into a fraud suit, of circumventing the limitation that the doctrine of consideration is supposed . . . to place on making all promises legally enforceable, and of thwarting the rule that denies the award of punitive damages for breach of contract.'").

fact, (3) the defendant[s] had knowledge of its falsity, (4) the defendant[s] intended to deceive, (5) the plaintiffs acted in reliance on the misrepresentation, and (6) the reliance was reasonable." *In re U.S. Office Prods*. *Co. Sec. Litig*., 251 F. Supp. 2d 77, 100 (D.D.C. 2003) (citing *R & A, Inc. v. Kozy Korner, Inc.*, 672 A.2d 1062, 1066 (D.C. 1996); *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C. 1992)).  "Fraudulent inducement to enter a contract requires [that the] misrepresentation or omission . . . pertain[] to an essential term of a contract and the intent to convince a plaintiff to enter the contract."  *Butler v. Enter. Integration Corp*., 459 F. Supp. 3d 78, 96 (D.D.C. 2020) (citing *In re U.S. Office Prods.*, 251 F. Supp. 2d at 100).  The heightened pleading requirements of Rule 9(b) require "the pleader provide the 'who, what, when, where, and how' with respect to the circumstances of the fraud."  *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)); *see also* Fed. R. Civ. P. 9(b).

G Street has not alleged a single concrete representation of fact made by anyone associated with JM.  Instead, G Street's briefing on this point simply rehashes the *actions* taken by Matthew and Norman Jemal—as JM's principals—after negotiations began.  *See* Pl.'s Opp'n at 15–17.  While these actions may have legal consequences, they are not material factual representations addressing a contract term.  As such, the Amended Complaint fails to meet even the most basic of requirements to state a claim for fraudulent inducement: pleading with particularity the "time, place, and content of the false misrepresentations, the fact misrepresented . . . as well as the identi[ty] [of the] individuals allegedly involved in the fraud."  *Taylor v. Wells Fargo Bank, N.A.*, 85 F. Supp. 3d 63, 72 (D.D.C. 2015) (quoting *United States ex rel. Williams v. Martin-Baker Aircraft Co*., 389 F.3d 1252, 1256 (D.C. Cir. 2004)) (internal quotations and citations omitted).

At best, G Street alleges that JM represented that it would "enter into and honor the Assignment." Pl.'s Opp'n at 18.  While D.C. law does allow plaintiffs to recover in tort when defendants agree to a contract knowing they will not perform, that is not what G Street has alleged here. *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 33 (D.D.C. 2016); *Va. Acad. of Clinical Psychologists v. Grp. Hospitalization and Med. Servs., Inc.*, 878 A.2d 1226, 1234 (D.C. 2005). G Street does not claim that JM never intended to follow through with its obligations under the contract.  Instead, G Street suggests, several times, that JM's decision was made at the "eleventh hour" and alleges that JM indicated that it no longer wished to go through with the Assignment "for the first time" after the Agreement had been signed and circulated by Ten Tavern and G Street.  Am. Compl. ¶¶ 46, 49, 56.  G Street's lone allegation pertaining to JM's intentions at the time the Agreement was entered reads: "Upon information and belief, JM fraudulently used Ten Tavern to induce Mr. Ercole and G Street in connection with the aborted assignment, prior to preventing G Street from occupying the Premises." *Id.* ¶ 57.  This conclusory statement is not enough. *Acosta Orellana v. CropLife Intern.*, 711 F. Supp. 2d 81, 96 (D.D.C. 2010) (finding the plaintiff's "open-ended time span" allegation that the fraud occurred "after 2005" insufficient to satisfy Rule 9(b)); *see also Twombly*, 550 U.S. at 555.  Because G Street does not allege that JM falsely represented material facts, or that JM, at the time it entered the agreement, had no intention of carrying out its contractual duties, G Street's fraudulent inducement claim fails. Therefore, JM's motion to dismiss Count II is hereby **GRANTED**.

### III.  Promissory Estoppel

Next, the Court considers whether G Street has pleaded a plausible promissory estoppel claim.[8]  To establish a prima facie case of promissory estoppel, a plaintiff must allege: "(1) a

---

[8] G Street pleads promissory estoppel in the alternative to Counts I and II.  Accordingly,

promise; (2) that the promise reasonably induced reliance on it; and (3) that [the plaintiff] relied

on the promise to [his or her] detriment." *Howard v. Fed. Express Corp.*, 280 F. Supp. 3d 26, 32

(D.D.C. 2017) (citing *Greggs v. Autism Speaks, Inc.*, 987 F. Supp. 2d 51, 55 (D.D.C. 2014)).  JM

argues that G Street failed to sufficiently plead facts supporting the first element: that there was a

promise.  Defs.' Br. at 12.  "[A] promise is an expression of intention that the promisor will

conduct himself in a specified way or bring about a specified result in the future, communicated

in such a manner to a promisee that he may justly expect performance and may reasonably rely

thereon."[9] *Howard*, 280 F. Supp. 3d at 32 (quoting *Headfirst Baseball LLC v. Elwood*, 168 F.

Supp. 3d 236, 247–48 (D.D.C. 2016)) (internal quotations omitted).  The terms of the promise

must be clearly stated.  "Given that reliance on an indefinite promise is unreasonable, 'a promise

[requires] definite terms on which the promisor would expect the promisee to rely.'" *Osseiran v.*

*Int'l Fin. Corp.*, 498 F. Supp. 2d 139, 147 (D.D.C. 2007), *aff'd,* 552 F.3d 836 (D.C. Cir. 2009)

(quoting *Arturi v. U.S. Office Prods. Co.*, 251 F. Supp. 2d 58, 73 (D.D.C. 2003)).  The promise

need not rise to the level of certainty required to establish the existence of a contract.  *Id.*

---

the claim can be considered despite the fact that under D.C. law "promissory estoppel applies to
arrangements only where no written agreements exist," and cannot be used to redress a breach of
contract.  *Parnigoni v. St. Columba's Nursey School*, 681 F. Supp. 1, 26 (D.D.C. 2010); *see
also Building Servs. Co. v. National R.R. Passenger Corp.*, 305 F. Supp. 2d 85, 96 (D.D.C. 2004)
(noting that "a party cannot assert a claim for promissory estoppel where there is an enforceable
contract").

[9] Defendants rely on a four-prong test that includes an element that asks whether the
defendant "expected Plaintiff[s] to take definite action in reliance of that promise," and fault the
complaint for failing to specifically allege that Defendants had such an expectation.  *Alemu v.
Dep't of For-Hire Vehicles*, 327 F. Supp. 3d 29, 44 (D.D.C. 2018) (citing *Morris v. Runyan*, 870
F. Supp. 362, 373 (D.D.C. 1994); Defs.' Br. at 12.  In the more commonly used three-prong
version, the definition of a promise encompasses the defendant's reasonable expectation that the
plaintiff would rely on the promise.  *See Howard*, 280 F. Supp. 3d at 32.

G Street claims that JM made a promise that "the Lease would be assigned to G Street, G Street would take occupancy of the Premises and that G Street could then begin operating a 'Misconduct Tavern' brand sports bar on the Premises in the late [s]ummer or early [f]all of 2018."  Am. Compl. ¶ 83.  JM responds that G Street's use of the word "would" transforms the statement into a "statement of future intent" that falls short of a definite promise.  Defs.' Br. at 12.  JM is correct that a statement of future intent will not satisfy the requirements of promissory estoppel.  But the word "would" is susceptible to two interpretations.  "[W]ould," as used in the statement to G Street, might have been meant to communicate a potential or conditional future outcome, but it is just as plausible that the complaint uses "would" as the past tense of "will." *See Would*, Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary /would (last visited April 9, 2021) ("(1): used in an auxiliary function to express plan or intention").  "[A] complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'"  *Banneker Ventures, LLC, v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

The difference between a promise and a statement of future intention is the specificity of the statement.  When a statement is directly communicated, concrete and detailed, and contains a definite timeline, it is more likely to be a promise rather than a statement of future intention. *See, e.g.*, *Granfield v. Cath. Univ. of Am.*, 530 F.2d 1035, 1038–40 (D.C. Cir. 1976) (finding statements were an expression of intention rather than explicit promises because they were confusing, contradictory, and lacked a definitive timeline by which the future actions would be implemented); *Morris*, 870 F. Supp. at 374 (finding a statement was not a promise because of the "undefined place and time" at which the defendants expressed they would carry out their

supposed promise and because the statement was made in a press release, rather than directly between the specific parties).  G Street alleges a specific promise, made directly by JM to G Street with no reservations, contradictions, or open-ended timelines.  JM allegedly represented directly to G Street that the lease would be assigned and G Street would take occupancy of the Premises, and provided a definitive timeline.  Am. Compl. ¶ 83.  Put in the context of the larger relationship between the parties, JM's statement can plausibly be viewed as an "expression of intention that [JM] will conduct [itself] in a specified way or bring about a specified result in the future."  *Howard*, 280 F. Supp. 3d at 32.

G Street also plausibly alleges that its reliance on JM's promise was reasonable.  JM argues that reliance was unreasonable because the Agreement clearly stated that all parties must execute and deliver the Agreement before it could become effective, and JM never signed.  *See* Defs.' Br. at 13.  Nonetheless, JM's *conduct* could have made it reasonable for G Street to rely on its promise; JM consistently acted as if the Agreement was in effect, and actively encouraged and facilitated G Street's efforts to perform.  Thus drawing all inferences in G Street's favor, the complaint plausibly states a claim for promissory estoppel.[10]  As such, Defendant JM's motion to dismiss Count III is **DENIED**.

### IV.  Declaratory Judgment

The Court next considers Defendant JM's assertion that G Street's claim for declaratory relief under the Declaratory Judgment Act, raised in Count IV, should be dismissed because it is

---

[10] JM does not argue that G Street failed to adequately plead the third element of promissory estoppel, which asks whether G Street relied on JM's promise to its detriment.  G Street's contention that it "incur[ed] expense to purchase signage and obtain the necessary licenses and permits to do business at the Premises" is enough to demonstrate its detrimental reliance because, absent JM's promise, G Street would not have otherwise incurred those expenses.  Am. Compl. ¶ 87.

duplicative of the breach of contract and promissory estoppel claims.  Under the Declaratory

Judgment Act, courts have discretion to "declare the rights and other legal relations of any

interested party seeking such declaration."  28 U.S.C. § 2201(a).  In the D.C. Circuit, courts grant

a request for declaratory relief if doing so will (1) "serve a useful purpose in clarifying the legal

relations at issue" or (2) "terminate and afford relief from the uncertainty, insecurity, and

controversy giving rise to the proceeding."  *Glenn v. Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016)

(citing *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980)).  That said, "there is no

absolute right to declaratory relief in federal courts."  *Harford Mut. Ins. Co. v. New Ledroit Park*

*Bldg. Co., LLC*, 313 F. Supp. 3d 40, 45 (D.D.C. 2018) (quoting *Glenn*, 222 F. Supp. 3d at 35).

Courts routinely deny requests for declaratory relief when such relief would be duplicative of

other claims in the litigation or would otherwise not effectuate the purpose of the Declaratory

Judgment Act.  *See, e.g.*, *Butler*, 459 F. Supp. 3d at 108 (dismissing plaintiff's claim for

declaratory relief under the Declaratory Judgment Act because judgment on the breach of

contract claim "would defeat the need for a declaration"); *Lannan Found. v. Gingold*, 300 F.

Supp. 3d 1, 31 (D.D.C. 2017) (dismissing declaratory judgment claim because it raised issues

"duplicative of those addressed by the breach of contract claims").

Declaratory relief here is not necessary to "allow the uncertain party to gain relief from

the insecurity caused by a potential suit waiting in the wings."  *Butler*, 459 F. Supp. 3d at 108

(quoting *Glenn*, 222 F. Supp. 3d at 36).  G Street seeks a declaration that "the Lease be assigned

to G Street, that G Street be allowed to take occupancy of the Premises[,] and that G Street be

allowed to operate a 'Misconduct Brand' sports bar at the Premises[.]"  Am. Compl. ¶ 95.

Resolving Count I's breach of contract claim and Count III's promissory estoppel claim—both

of which survive JM's motion to dismiss—will, in one way or another, moot the need for a

declaration.  *See, e.g.*, *Lannan Found.*, 300 F. Supp. 3d at 31.  At bottom, after G Street's

surviving claims are resolved, there will be no uncertainty justifying declaratory relief, and

therefore the purpose of declaratory judgment cannot be served in this case.  *See Glenn*, 222 F.

Supp. 3d at 37–38.  For that reason, the Court **GRANTS** Defendants' Motion as to Count IV.  G

Street's claim for declaratory judgment with respect to JM is hereby dismissed.[11]

### V.  Tortious Interference with Contractual Relationship

The final issue before the Court is whether G Street's sole claim against Douglas, for

tortious interference with a contractual or prospective business relationship, contains sufficient

factual allegations to survive a 12(b)(6) motion.  To prevail on a claim of tortious interference

under District of Columbia law, a plaintiff must prove: "(1) the existence of a valid contractual

or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional

interference with that relationship by the defendant; and (4) resulting damages."  *NCRIC, Inc. v.

Columbia Hosp. for Women Med. Ctr., Inc.*, 957 A.2d 890, 900 (D.C. 2008); *see also Zelaya v.

Unicco Serv. Co.*, 587 F. Supp. 2d 277, 286 (D.D.C. 2008).

Consistent with Defendants' theory throughout, Douglas argues that there was no

cognizable relationship between JM and G Street.  *See* Defs.' Br. at 10.  However, G Street has

plausibly alleged a contractual or prospective business relationship with JM.  *See* Am. Compl.

¶¶ 81–90, 96.  Under D.C. law, for a tortious interference claim, the required "contractual or

other business relationship" can be based on a "valid business relationship *or expectancy*."

*Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In other words, this tort claim

---

[11] Although Count IV also seeks relief from Ten Tavern, Ten Tavern has not joined JM and Douglas's Motion—or appeared in this matter at all.  Consequently, and given that 707 G has not raised breach of contract or promissory estoppel claims against Ten Tavern, the Court limits its dismissal to the claims against JM.

encompasses prospective business opportunities that are "commercially reasonable to anticipate." *Banneker Ventures*, 798 F.3d at 1134; *Browning*, 292 F.3d at 242.  There must be "more than a 'hope' of closing the deal." *Banneker*, 798 F.3d at 1135.  Here, there was more than a "hope."  As discussed in detail above, the parties' conduct suggested that the Agreement was already in place.  That, in turn, made it commercially reasonable to believe that the Agreement would be signed.  Therefore, G Street plausibly alleges that it had a valid business relationship or prospective business relationship with JM.

Turning to the second element, G Street plausibly alleges that Douglas was aware of the relationship between G Street and JM.  G Street's allegations on this point are admittedly sparse: "Douglas is a close business affiliate of JM, and knew of—but apparently disapproved of—the transaction between JM, Ten Tavern, and G Street" and "Douglas was aware of the parties' contractual and/or prospective contractual relationship."  Am. Compl. ¶¶ 9, 98.  Defendants characterize these allegations as little more than a "recitation of the element" requiring that Douglas have knowledge of the relationship between G Street and JM.  *See Ashcroft*, 556 U.S. at 678; *Bell Atl. Corp*, 550 U.S. at 545; Defs.' Br. at 10–11.  But by alleging that there was a close business relationship between JM and Douglas, G Street has alleged facts that provide context for and bolster its allegation that Douglas had the requisite knowledge.  That clears the 12(b)(6) standard.  *See Craig v. Not for Profit Hosp. Corp.*, No. 18-cv-347, 2022 WL 4119766, at *15 (D.D.C. Sept. 9, 2022) (finding that plaintiff's allegations that decisionmaker defendant "decided to reduce [plaintiff's] pay and that decision was carried out by another defendant at the direction of [the decisionmaker defendant]" supported a claim of tortious interference at the motion to dismiss stage).  It is difficult to imagine what further detail G Street could provide absent discovery.

Third, the Court must determine whether G Street has alleged facts that plausibly establish that Douglas intentionally interfered with G Street and JM's business relationship. Intentional interference "may be any conduct conveying to the third person the actor's desire to influence him not to deal with the other." *Banneker*, 798 F.3d at 1136 (quoting Restatement (Second) of Torts § 766 cmt. k.). The plaintiff need not plead that the defendant used "egregious means, such as libel, slander, coercion, or disparagement" to allege tortious interference. *Id.* G Street alleges that "Douglas . . . directed or otherwise induced JM and/or Ten Tavern to breach and/or refuse to fulfill the parties' agreed-upon contractual and business relationship[.]" Am. Compl. ¶ 102. Defendant Douglas asserts that this allegation is too conclusory.

G Street adequately pleads intentional interference.[12] To be sure, G Street's allegations are lean and provide less detail than those raised in *Banneker*, 798 F.3d at 1135–36. In *Banneker*, the plaintiff alleged a competitor firm made major campaign contributions to induce WMATA to breach its contract with the plaintiff, and specifically alleged that the firm repeatedly made phone calls to disparage the plaintiff. *See id.* However, Rule 12(b)(6) does not require that level of detail. G Street's allegations clearly identify Douglas as an entity "directing or otherwise inducing" JM's breach of the parties' agreement and further alleges that Douglas was motivated by its desire to use the space for its own ends. Am. Compl. ¶¶ 10, 101–02. G Street's characterization of Douglas as a "close business affiliate," *id.* ¶ 9, makes it plausible that Douglas could have played this role. That is enough to satisfy Rule 12(b)(6).

Douglas further asserts that, even if G Street has otherwise successfully plead its tortious interference claim, Douglas's actions were privileged. *See* Defs.' Br. at 11–12. Douglas invokes

---

[12] G Street also adequately plead that it suffered resulting damages caused by the interference with the contractual relationship, or the fourth element of a tortious interference claim. *See* Am. Compl. ¶¶ 12, 78–79.

a D.C. law doctrine that permits a defendant to "avoid liability for tortious interference with contract after the plaintiff establishes a prima facie case if the defendant can establish that his conduct was legally justified or privileged." *Raskauskas v. Temple Realty Co.*, 589 A.2d 17, 27 (D.C. 1991); *see also Vantage Commodities Fin. Servs. I, LLC v. Willis Ltd.*, 531 F. Supp. 3d 153, 179 (D.D.C. 2021).  A defendant is "privileged if he acts in order to protect 'a present, existing economic interest.'"  *Murray v. Wells Fargo Home Mortgage*, 953 A.2d 308, 326 (D.C. 2008) (quoting *Dresser v. Sunderland Apartments Tenants Ass'n*, 465 A.2d 835, 839 n.12 (D.C. 1983)).  This privilege is narrow and "protects the actor only when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means."  *Armstrong v. Thompson*, 80 A.3d 177, 191 n.7 (D.C. 2013) (citing Restatement § 773 cm. a (1977)) (internal quotation marks omitted).

The facts plead regarding Douglas's alleged motivation to disrupt G Street's use of the Premises do not establish the privilege defense.  Absent additional facts, the Court cannot conclude that Douglas's alleged desire to profit by using the leased space for its own purposes is a legally protected interest.  *See generally Legal Tech. Group, Inc. v. Mukerji*, No. 17-cv-631, 2019 WL 9143477, *17 (D.D.C. June 10, 2019) (noting that under the Restatement "an interest in competition alone will not suffice" to establish a legally protected interest that defeats a tortious interference claim).  Nor is there a basis for the Court to conclude that asking a business affiliate to withdraw from the deal with G Street was an appropriate means of protecting that interest.  This defense may be available at a later stage, on a more fully developed record, but currently is not applicable.  Consequently, Defendant Douglas's motion to dismiss Count V is hereby **DENIED**.

**CONCLUSION**

For the foregoing reasons, the Court hereby GRANTS Defendants' Motion to Dismiss Counts II and IV, but DENIES their Motion with respect to Counts I, III, and V.


Date: March 20, 2023                    Signed: _____

                                                                   Robin M. Meriweather

                                                                    United States Magistrate Judge